1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EDWIN McMILLAN,                           No.  2:  13-cv-0578 MCE KJN P

12                  Plaintiff,

13         v.                                  ORDER AND FINDINGS AND
                                               RECOMMENDATIONS
14   S. RINGLER, et al.,

15                  Defendants.

16

17   I.  Introduction

18         Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

19   to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion.  (ECF

20   No. 77.)  Also pending are plaintiff's motion to file a supplemental complaint (ECF No. 78),

21   defendants' motion to strike (ECF No. 95), and plaintiff's motion to strike (ECF No. 100).

22         For the reasons stated herein, the undersigned recommends that defendants' summary

23   judgment motion be granted as to the claim that defendant Scotland conspired to violate

24   plaintiff's right to practice his religion in violation of the Bane Act.  Defendants' motion should

25   be denied in all other respects.  The undersigned further recommends that plaintiff's motion to

26   file a supplemental complaint be denied.  The undersigned denies the motions to strike.

27   ////

28   ////

                                             1

II.  <u>Motion to File Supplemental Complaint</u>

Plaintiff filed a motion to file a supplemental complaint.  (ECF No. 78.)  However, plaintiff did not file a proposed supplemental complaint.  As a prisoner, plaintiff's pleadings are subject to evaluation by this court pursuant to the in forma pauperis statute.  See 28 U.S.C. § 1915A.  Because plaintiff did not submit a proposed supplemental complaint, the court is unable to evaluate it.  It is not clear, for example, whether plaintiff intends to name new defendants.  For this reason, plaintiff's motion to file a supplemental complaint should be denied.[1]

III.  <u>Motions to Strike</u>

A.  <u>Defendants' Motion to Strike</u>

Defendants move to strike three pleadings filed by plaintiff:  1) first amended declaration filed in support of his opposition; 2) second amended declaration filed in support of his opposition; and 3) first amended statement of disputed facts.  (ECF No. 95.)  Because the second amended declaration supersedes the first amended declaration, the motion to strike the first amended declaration is denied as unnecessary.

The background to defendants' motion to strike follows herein.

After having been granted two extensions of time, pursuant to the mailbox rule, plaintiff filed his original opposition on July 31, 2017.  (ECF No. 84.)  On that date, plaintiff also filed his statement of disputed facts, declaration, and declaration by Gaby Itierno.  (ECF Nos. 85, 86, 87.)  Plaintiff's declaration is 138 pages, including exhibits.  (ECF No. 86.)  Plaintiff's statement of disputed facts is 6 pages long.  (ECF No. 85.)

Plaintiff filed the first amended declaration in support of his opposition on August 8, 2017.  (ECF No. 89.)  The amended declaration is 141 pages, including exhibits.  (Id.)  The proof of service attached to the amended declaration does not identify the date it was mailed.  (Id. at 141.)  However, plaintiff signed the amended declaration on August 6, 2017.  (Id. at 9.)

////

---

[1]  In the opposition to plaintiff's motion to file a supplemental complaint, defendants also correctly observe that plaintiff is attempting to raise claims in the supplemental complaint that were previously dismissed.  (ECF No. 81.)

Pursuant to the mailbox rule, plaintiff filed the second amended declaration in support of his opposition on August 11, 2017. (ECF No. 90 at 139.) The second amended declaration is 139 pages, including exhibits. (Id.) Pursuant to the mailbox rule, plaintiff filed the amended statement of disputed facts on August 11, 2017. (ECF No. 91 at 20.) The amended statement of disputed facts is 20 pages. (Id.)

In the pending motion, defendants argue that the second amended declaration and amended statement of disputed facts should be stricken because plaintiff was granted two extensions of time to file his opposition. (ECF No. 95.) Defendants argue that plaintiff should not be permitted to ignore the court's order imposing a specific deadline for opposing their motion. (Id.)

On November 27, 2017, plaintiff filed an opposition to defendants' motion to strike. (ECF No. 101.) Plaintiff alleges that in a rush to meet the July 31, 2017 deadline for filing his opposition, several mistakes were made in editing and typing, which he identified after the documents were mailed. Plaintiff alleges that he prepared the amended documents in an attempt to correct those mistakes.

On November 30, 2017, defendants filed a reply to plaintiff's motion to strike. (ECF No. 103.) Defendants argue that while plaintiff claims that he only sought to correct typographical errors in his amended pleadings, his amended statement of disputed facts bears no resemblance to the original statement of disputed facts.

It is well-established that the pleadings of pro se litigants are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curium). Nevertheless, "[p]ro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citations omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc). However, the unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they are subject to "the handicaps ... detention necessarily imposes upon a litigant," such as "limited access to legal materials" as well as "sources of proof." Jacobsen v. Filler, 790 F.2d 1362, 1364–65 & n.4 (9th Cir. 1986) (citations and internal quotation marks omitted). Inmate

litigants, therefore, should not be held to standard of "strict literalness" with respect to the requirements of the summary judgment rule. Id. at 1364 n.4 (citation omitted).

The court is mindful of the Ninth Circuit's more overarching caution in this context, as noted above, that district courts are to "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

The original and second amended declarations contain the same exhibits. The original declaration is, apparently inadvertently, missing paragraphs 32-34. The second amended declaration includes these paragraphs. Otherwise, the original and second amended declarations appear to be substantially identical. Because of these minor differences between the original and second amended declarations, defendants' motion to strike the second amended declaration is denied. Accordingly, the undersigned considers the second amended declaration when evaluating defendants' summary judgment motion.

Plaintiff's original statement of disputed facts is just that, i.e., a statement of disputed facts. The amended statement of disputed facts includes the statement of disputed facts contained in the original pleading as well as a response to defendants' statement of undisputed facts. While plaintiff should have included his response to defendants' statement of undisputed facts with his original statement of disputed facts, he did not significantly delay in filing the amended pleading containing this additional briefing. Moreover, this amended pleading assists the court in evaluating defendants' summary judgment motion. Accordingly, defendants' motion to strike plaintiff's amended statement of disputed facts is denied.

B. Plaintiff's Motion to Strike

Plaintiff moves to strike the new evidence attached to defendants' reply to his opposition. The background to this motion follows herein.

On September 22, 2017, defendants filed the reply to plaintiff's opposition. (ECF No. 93.) This reply contained evidence not previously presented by defendants in support of the summary judgment motion, i.e., defendant Ringler's declaration in support of the reply, and declarations by M. Hall and G. Bickham in support of the reply. (ECF Nos. 93-1, 93-2, 93-3.)

4

On October 23, 2017, plaintiff filed a motion to file a sur-reply to defendants' reply. (ECF No. 96.)  On October 31, 2017, the undersigned granted this motion on grounds that defendants' reply contained new evidence.  (ECF No. 98.)  On November 27, 2017, plaintiff filed a sur-reply, which also contained the pending motion to strike.  (ECF No. 100.)

Because plaintiff has had an opportunity to respond to the new evidence contained in defendants' reply, he is not prejudiced by the court's consideration of this new evidence. Accordingly, plaintiff's motion to strike is denied.

IV.  Summary Judgment Motion

A.  Relevant Pleadings

The undersigned herein clarifies the pleadings relevant to the pending summary judgment motion:  1) defendants summary judgment motion (ECF No. 77); 2) plaintiff's opposition to defendants' summary judgment motion and declaration of Gaby Iteriano (ECF Nos. 84, 87); 3) plaintiff's second amended declaration in support of the opposition (ECF No. 90); 4) plaintiff's amended statement of disputed facts (ECF No. 91); 5) defendants' reply (ECF No. 93) and 6) plaintiff's sur-reply (ECF No. 100).

B.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).

////

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on March 31, 2014 (ECF No. 22), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

C. Plaintiff's Claims

In the verified second amended complaint, plaintiff alleges that in October 2012, he was summoned to the B Facility program office at California State Prison-Solano ("CSP-Solano") to receive a telephone call from a judge regarding a settlement conference. (ECF No. 45 at 4.) The telephone call occurred in defendant Scotland's office. (Id.) During the telephone call, defendant Scotland displayed anger toward plaintiff and repeatedly asked why the telephone call was routed through his office. (Id.) Defendant Ringler arrived shortly later and defendant Scotland told

defendant Ringler the purpose of plaintiff's telephone call.  (Id.)  At this time, plaintiff told the judge that defendants Ringler and Scotland were listening to the discussion.  (Id.)  Plaintiff told the judge that defendants' presence made him uncomfortable.  (Id.)

Approximately 1 1/2 hours into the mediation, defendant Scotland told plaintiff to go sit on the bench in the hallway.  (Id.)  Plaintiff heard defendant Scotland tell the judge that he did not want plaintiff on his phone.  (Id.)  Plaintiff was then moved to a different location and given access to another phone to finish the settlement conference.  (Id. at 4-5.)

As a result of hearing plaintiff on the telephone, plaintiff alleges that defendant Ringler and Scotland became aware that plaintiff was engaged in civil litigation against the California Department of Corrections and Rehabilitation ("CDCR") or its officers.  (Id. at 5.)

Plaintiff alleges that on December 5, 2012, defendants Ringler and Zuniga conducted a contraband search of plaintiff's housing area in retaliation for his legal activities.  (Id.)  Prior to that time, contraband searches were conducted by the correctional officers assigned to the respective housing units.  (Id.)  From October 2012 until around January 17, 2013, defendants Ringler and Zuniga were assigned as yard Security and Escort officers for Facility D.  (Id.)  Defendants Ringler and Zuniga also supervised the D yard recreational area and yard crew workers.  (Id.)  In other words, they were not assigned to plaintiff's housing unit.  Plaintiff alleges that on December 5, 2012, defendants Ringler and Zuniga abandoned their Search and Escort positions in order to conduct the contraband search in plaintiff's dorm living area.  (Id.)

Plaintiff alleges that prior to December 5, 2012, contraband searches were conducted once per month.  (Id.)

Plaintiff alleges that during the December 5, 2012 search, plaintiff's bed linens, personal effects and photographs of family members were thrown to the ground.  (Id.)  In addition, plaintiff's legal materials were unbound and separated from their binding, and two of plaintiff's Holy Korans were destroyed and desecrated.  (Id.)  At the end of the search, defendant Ringler asked plaintiff in a sarcastic voice, "How did your case turn out?"  (Id.)  After asking this question, defendant Ringler confiscated plaintiff's personal appliances.  (Id.)

////

8

At the end of the search, plaintiff told his housing unit officers Rothman and Williamson to summon the facility sergeant to take note of and document the status of his property. (Id.) After making a telephone call, Officer Rothman told plaintiff that the facility sergeant on duty, Sergeant Militano, had instructed plaintiff to "put it in a 602." (Id.)

Plaintiff alleges that the circumstances of the search of his property were memorialized by the CSP-Solano Catholic Chaplain R. Boyle, in a memorandum dated December 6, 2012. (Id.) On that same day, the memorandum was personally delivered to Associate Warden Young. (Id.) Associate Warden Young summoned Investigative Lieutenant Brown to photograph "them" for evidentiary purposes. (Id.) By "them," plaintiff apparently refers to his Holy Korans.

On December 14, 2012, defendant Ringler stated to plaintiff, "I know all about you. I'm not finished with you yet." (Id. at 6.) Defendant Ringler made this statement in the presence of Lieutenant Bickham. (Id.) Plaintiff asked Lieutenant Bickham to intercede on his behalf concerning defendant Ringler's statements and actions. (Id.)

Plaintiff filed a 602 grievance alleging that the December 5, 2012 search was retaliatory and in violation of prison regulations. (Id.) Plaintiff submitted another grievance requesting the return of the personal property confiscated by defendant Ringler during the search. (Id.)

Prior to or during the completion of the investigation of this grievance, on January 17, 2013, defendant Ringler submitted a chrono stating that plaintiff was attempting to file a class action against him. (Id.) Defendant Ringler stated that based on this class action, plaintiff should be deemed a threat to him and the safety of the institution. (Id.)

Plaintiff alleges that former defendant Henry issued a CDCR Form 114 "lock up order," referencing defendant Ringler's claim that plaintiff should be deemed an institutional security concern for his involvement in a class action lawsuit naming defendant Ringler. (Id. at 9.) As a result of the lock-up order, plaintiff was moved to administrative segregation ("ad seg"). (Id. at 10.)

Following resolution of defendants' motion to dismiss, the following five claims remain against defendants Ringler, Zuniga and Scotland. (ECF No. 65.) First, plaintiff alleges that on December 5, 2012, defendants Ringler, Zuniga and Scotland retaliated against him for his legal

activities by searching his property.  Second, plaintiff alleges that during the December 5, 2012

search, defendants Zuniga and Ringler destroyed and desecrated his Holy Korans in retaliation for

his legal activities.  Third, plaintiff alleges that on January 17, 2013, defendant Ringler prepared a

chrono in retaliation for his legal activities.  Fourth, plaintiff alleges that following the December

5, 2012 search, defendant Ringler confiscated his personal property in retaliation for his legal

activities.  Fifth, plaintiff alleges that defendants Ringer, Zuniga and Scotland conspired to

retaliate against him for his legal activities and to violate his religious freedom pursuant to

California Civil Code § 52.1, i.e., the Bane Act.

D.  Legal Standard for Retaliation

It is well-established that prison inmates have a constitutional right to freedom from

retaliation for engaging in activity protected by the First Amendment.  Rhodes v. Robinson, 408

F.3d 559 (9th Cir. 2005).  A prisoner retaliation claim has five elements.  First, plaintiff must

allege and show that he engaged in conduct protected by the First Amendment.  See Watison v.

Carter, 668 F.3d 1108, 1114 (9th Cir. 2012).  Second, a "plaintiff must claim that the defendant

took adverse action against the plaintiff."  Id. (citing Rhodes, 408 F.3d at 567).  "The adverse

action need not be an independent constitutional violation."  Id. (citing Pratt v. Rowland, 65 F.3d

802, 806 (9th Cir. 1995)).  Third, the plaintiff must allege and show a causal connection between

the protected conduct and the adverse action.  Id.  Fourth, the plaintiff must allege and prove

either a chilling effect on the exercise of First Amendment rights or some other harm.  Id.

Finally, plaintiff must allege and show that the retaliatory action "'did not advance legitimate

goals of the correctional institution....'"  Id. (quoting Rizzo v. Dawson, 778 F.2d 527, 532 (9th

Cir. 1985)).

E.  Analysis of Claim 1:  Alleged Retaliatory Search

1.  Undisputed Facts

At the outset, the undersigned observes that in their declarations, defendants describe

plaintiff as living in a cell.  Defendants discuss how they entered and searched the cell shared by

plaintiff and inmate McClellan.  However, plaintiff alleges that he was housed in a dorm-setting,

and not in a cell.  Whether plaintiff was housed in a cell or a dorm is disputed, but not material,

for purposes of the court's evaluation of defendants' summary judgment motion.

One of the duties of correctional officers is to conduct random searches for contraband. (Undisputed Fact No. 2; ECF No. 77-6 at 1; ECF No. 91 at 2.)

Cell phones and cell phone accessories are contraband, and inmates are not allowed to have them. (Undisputed Fact No. 6; ECF No. 77-6 at 2; ECF No. 91 at 2.)

On November 13, 2012, defendant Ringler was walking through plaintiff's housing facility, and he saw plaintiff lying on his bed, concealed by an inmate-manufactured curtain. (Undisputed Fact No. 8; ECF No. 77-6 at 2; ECF No. 91 at 3.) Defendant Ringler opened the curtain and found a cell phone in plaintiff's possession and confiscated it. (Undisputed Fact Nos. 9, 10; ECF No. 77-6 at 2; ECF No. 91 at 3.)

Several days after November 13, 2012, defendant Zuniga was working in plaintiff's housing facility, and he saw plaintiff's "cell-mate," inmate McClellan, on his bunk, concealed behind a towel, acting suspiciously. (Undisputed Fact No. 11; ECF No. 77-6 at 2; ECF No. 91 at 3.)

Defendant Zuniga suspected that inmate McClellan had a cell phone, and he told defendant Ringler about his suspicion. (Undisputed Fact No. 12; ECF No. 77-6 at 2.)

On December 5, 2012, defendants Ringler and Zuniga searched plaintiff's "cell." When defendants Ringler and Zuniga entered the "cell" on December 5, 2012, plaintiff and inmate McClellan were on their bunks. (Undisputed Fact No. 14; ECF No. 77-6 at 2; ECF No. 91 at 4.) Defendant Ringler saw inmate McClellan make a move from under the covers. (Undisputed Fact No. 15; ECF No. 77-6 at 2; ECF No. 91 at 4.) Defendants Ringer and Zuniga searched both inmates and sent them downstairs to wait while they searched the "cell." (Undisputed Fact No. 16; ECF No. 77-6 at 2; ECF No. 91 at 5.)

Defendant Ringler first found inmate McClellan's cell phone holder on his bed and then his cell phone, which inmate McClellan had dropped down the wall beside plaintiff's bed. (Undisputed Fact No. 17; ECF No. 77-6 at 3; ECF No. 91 at 5.)

Defendants summoned both inmates and asked whose cell phone it was. (Undisputed Fact No. 18; ECF No. 77-6 at 3; ECF No. 91 at 5.) Inmate McClellan said it was his cell phone.

11

(Undisputed Fact No. 19; ECF No. 77-6 at 3; ECF No. 91 at 5.)

In searching further, defendants Ringer and Zuniga found a USB charging cord for an I-phone and a six foot video cable for an I-phone. (Undisputed Fact No. 20; ECF No. 77-6 at 3; ECF No. 91 at 5.) Defendants also found a brand new I-phone hands free ear piece. (Undisputed Fact No. 21; ECF No. 77-6 at 3; ECF No. 91 at 5.) Defendants also found an I-phone. (Undisputed Fact No. 22; ECF No. 77-6 at 3; ECF No. 91 at 6.)

Defendants confiscated the items of contraband they found during the search. (Undisputed Fact No. 23; ECF No. 77-6 at 3; ECF No. 91 at 6.)

Because contraband was discovered, defendant Scotland was informed about the search after it took place. (Undisputed Fact No. 24; ECF No. 77-6 at 3; ECF No. 91 at 6.)

2. Discussion

Defendants move for summary judgment as to plaintiff's claim alleging that the December 5, 2012 search was retaliatory on four grounds: 1) the search advanced legitimate correctional goals; 2) defendants Ringler and Zuniga were unaware of plaintiff's legal activities, i.e., his protected conduct; 3) defendant Scotland did not know about the search until after it occurred; and 4) the search did not have a chilling effect on plaintiff's First Amendment rights. The undersigned addresses each of these arguments herein.

*Did the December 5, 2012 Search Advance Legitimate Penological Goals?*

For the following reasons, the undersigned finds that whether the December 5, 2012 search advanced legitimate penological goals is a disputed fact.

Defendants Zuniga and Ringler argue that they searched plaintiff's "cell" on December 5, 2012 because 1) on November 13, 2012, they confiscated a cell phone from plaintiff; and 2) days before December 5, 2012, defendant Zuniga saw plaintiff's "cell mate," inmate McClellan, acting suspiciously. In their declarations, defendants state that these were the reasons they searched plaintiff's "cell." (ECF No. 77-2 at 2; ECF No. 77-3 at 2.) Defendants argue that their suspicions were confirmed when they discovered contraband, i.e., a cell phone and cell phone accessories hidden in plaintiff's property. (ECF No. 77-2 at 2.)

////

Plaintiff suggests that defendants did not truly believe that he had a cell phone, and that they searched his property in retaliation for his legal activities, i.e., the search was a pretext for retaliation.  In support of this claim, plaintiff alleges that during the search, his bed linens, personal effects and photographs of family members were strewn on the floor.  (ECF No. 90 at 5.) Plaintiff also alleges that defendants tore one of his Holy Korans lengthwise and put his other Holy Koran face down in an unknown liquid.  (Id.)   As discussed herein, defendants deny destroying and desecrating plaintiff's Korans.

Plaintiff also alleges that after the search, defendant Ringler said to him, "How did your case turn out?"  (Id.)  Plaintiff alleges that after the disciplinary hearing where he was found not guilty of possessing the cell phone found in his property during the search, defendant Ringler said to him, "I know all about you.  I'm not finished with you yet."  (Id. at 6.)

Preserving institutional order, discipline and security are legitimate penological interests that, if they in fact motivated the acts taken, will defeat a retaliation claim.  See Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994).  However, "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right."  Bruce v. Ylst, 351 F.3d 1283, 1289–90 (9th Cir. 2003); see also West v. Dizon, 2014 WL 794335 at *6 (E.D. Cal. 2014) (citing Wilson v. City of Fountain Valley, 372 F.Supp.2d 1178, 1190 (C.D. Cal. 2004) ("Regardless of the outcome (i.e., confiscation of an inmate's property), a prison search can constitute an 'adverse action' necessary to support a claim of retaliation.  'Mt. Healthy[City School Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274 (1977)] and its progeny do not properly immunize defendants who abuse state authority by engaging in a retaliatory act, yet who, in the course of that act, happen to discover evidence incriminating the plaintiff.'")

For the reasons stated herein, the undersigned finds that while defendants may have been justified in their search of plaintiff's housing area and inmate McClellan's property for a cell phone, plaintiff has presented sufficient evidence from which a jury could find that the continued search of plaintiff's property was a pretext for retaliation.  Plaintiff's description of defendants'

conduct during the search, i.e. allegedly strewing his property on the floor and destroying his Korans, and defendant Ringler's alleged statements, are evidence that defendants allegedly searched plaintiff's property to retaliate against him for his legal activities. Defendants' alleged conduct during the search supports plaintiff's retaliation claim. See Bruce, 351 F.3d at 1289 (statements and suspect timing raised triable issue of fact regarding whether the defendants' motive behind plaintiff's gang validation was retaliatory).

If a jury finds that defendants searched plaintiff's property in retaliation for his legal activities, it could reasonably find for plaintiff despite the cell phone and cell phone accessories found in his property during the search. See Bruce, 351 F.3d at 1289 ("But, if, in fact, the defendants used the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have arguably ended up where he belonged.") (citing Rizzo, 778 F.2d at 532).

In addition, the undersigned also observes that the results of the disciplinary proceedings against plaintiff based on the discovery of the cell phone hidden in his property may also be evidence in support of his retaliation claim. In his declaration, defendant Ringler describes the contraband and where he allegedly found it:

> I first found McClellan's cell-phone holder on his bed and his cell phone, which he had dropped down the wall beside McMillan's bed. I summoned both inmates and asked whose cell phone it was. McClellan said it was his. In searching further, I found a USB charging cord for an i-phone and a six foot video cable for an i-phone in McMillan's typewriter. We continued the search and found a brand new i-phone hands-free ear piece in McMillan's locker. As I searched McMillan's legal papers, I found an i-phone in a cut-out in the middle of his papers.

(ECF No. 77-2 at 2.)

Based on these discoveries, defendant Ringler issued a rules violation report charging plaintiff with possession of dangerous contraband. (ECF No. 93-1 at 4.) Attached to defendant Ringler's declaration filed in support of the reply is a document titled "Multi-Purpose Worksheet." (Id.) This document describes the contraband found during the search and where it was found. (Id.) This document states that plaintiff was charged with "possession of dangerous

contraband/cell phone." (Id.)

Attached to defendants' reply is the declaration of Captain Bickham, who conducted plaintiff's disciplinary hearing. (ECF No. 93-3.) Captain Bickham states that plaintiff called inmate McClellan as his witness during the disciplinary hearing. (Id. at 2.) Inmate McClellan testified that the cell phone "in question" that was found in the cell belonged to him. (Id.) Captain Bickham states that he suspected that plaintiff may have convinced inmate McClellan to claim ownership of the cell phone. (Id.) Captain Bickham states that inmates that are more influential or committed to "life" terms have been suspected of convincing and/or paying inmates with release dates to take blame for incidents. (Id.) In so doing, the lifer inmate increases their possibility to receive a parole date when attending their Board of Prison Hearing. (Id.) Captain Bickham concludes, "[n]evertheless, because inmate McClellan claimed ownership of the cell phone, I found McMillan not guilty of the offense."[2] (Id.)

The undersigned is puzzled by Captain Bickham's finding that plaintiff was not guilty of possession of the cell phone. Even with inmate McClellan's claim of ownership, this finding is somewhat perplexing considering that the phone and other phone accessories were allegedly found hidden in plaintiff's property. Captain Bickham's finding meant that inmate McClellan had two cell phones in the area he shared with plaintiff. Neither party filed the report from the rules violation hearing, which may have shed more light on Captain Bickham's finding. Captain Bickham's not-guilty finding may be further evidence of pretext.[3]

In sum, the court finds that plaintiff has submitted sufficient evidence to establish a genuine issue of material fact as to whether the search advanced legitimate penological goals.

---

[2]  Captain Bickham does not state that plaintiff was a "lifer." Captain Bickham also does not state that plaintiff was more influential than inmate McClellan.

[3]  The undersigned also observes that in his declaration, Lieutenant Henry states that no property was confiscated from Inmate McClellan following the search. (ECF No. 77-5 at 2.) This statement contradicts defendant Ringler's statement that he found inmate McClellan's cell phone holder and cell phone during the search. (ECF No. 77-2 at 3.) This statement also contradicts the evidence locker log book stating that cell phones were confiscated from both plaintiff and inmate McClellan. (ECF No. 93-2 at 4.) Evidence that inmate McClellan was allowed to keep his cell phone and/or received no disciplinary charges would potentially support plaintiff's claim that the search was retaliatory.

*Did Defendants Ringler and Zuniga Have Knowledge of Plaintiff's Legal Activities?*

For the reasons stated herein, the undersigned finds that whether defendants Ringler and Zuniga had knowledge of plaintiff's legal activities is a disputed fact.

In his declaration filed in support of the summary judgment motion, defendant Ringler states, in relevant part,

> 13. At the time of my first search of McMillan's cell on November 13, 2012, McMillan had never filed any grievances or lawsuits against me. I did not know whether he had filed any grievances or lawsuits against any other prison officials. I never discussed McMillan's grievances, lawsuits, or other litigation activities with Officer Zuniga. Lt. Scotland, or anyone else.

(ECF No. 77-2 at 3.)

In his declaration, defendant Scotland states that on or around October 2012, the Litigation Office contacted him to ask if plaintiff could use his office for a "court call." (ECF No. 77-4 at 2.) Defendant Scotland asked defendant Ringler to assist him in supervising plaintiff while plaintiff was in his office. (Id.) Defendant Scotland states that he was unaware of the purpose of plaintiff's call, other than it was a "court call." (Id.) Defendant Scotland states that he did not know the court matter being discussed or whether any CDCR officials were involved. (Id.)

In his declaration, defendant Zuniga states, in relevant part,

> 10. At the time of the December 5, 2012 cell search, McMillan had filed no grievances or lawsuits against me. I did not know whether he had filed any grievances or lawsuits against any other prison officials. Because I was unaware of any of McMillan's grievances, lawsuits, or other legal activities, I never discussed them with Officer Ringler, Lt. Scotland or anyone else.

(ECF No. 77-3 at 3.)

In his second amended declaration, plaintiff alleges that during the October 2012 telephonic settlement conference, defendant Scotland told defendant Ringler that "it's a prison lawsuit." (ECF No. 90 at 4.) Plaintiff alleges that following the December 5, 2012 search,

defendant Ringler said to him, "How did your case come out?" (Id. at 5.) Based on these statements in plaintiff's declarations, the undersigned finds that whether defendant Ringler had knowledge of plaintiff's legal activities is a disputed fact.

Plaintiff does not allege that defendant Zuniga was present during the October 2012 telephonic settlement conference. Plaintiff also does not allege that defendant Zuniga made any statements to him regarding his legal activities. However, plaintiff alleges that both defendants Zuniga and Ringler participated in the destruction of his Holy Korans and strewing his property on the floor during the December 5, 2012 search. (Id. at 5.) As discussed above, plaintiff has presented evidence that defendant Ringler had knowledge of his legal activities. Plaintiff's declaration also indicates that defendant Ringler asked him, "How did your case come out?" in the presence of defendant Zuniga. (Id.) It is not unreasonable to infer from these allegations that defendant Zuniga had knowledge of plaintiff's legal activities when he searched plaintiff's property on December 5, 2012. Accordingly, the undersigned finds that whether defendant Zuniga had knowledge of plaintiff's legal activities is a disputed fact.

*Did Defendant Scotland Have Knowledge of the December 5, 2012 Search Before it Occurred?*

Defendants argue that defendant Scotland is entitled to summary judgment as to the retaliatory search claim because he did not know about the December 5, 2012 search until after it occurred. (ECF No. 77-4 at 2.) In his opposition, plaintiff disputes that defendant Scotland had no knowledge of the search before it occurred. (ECF No. 91 at 6.) However, plaintiff has provided no evidence in support of this claim.

Plaintiff claims that defendant Scotland conspired with defendants Ringler and Zuniga to retaliate against him for his legal activities. A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999). To prove a civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or common design and understanding, or a meeting of the minds in an unlawful agreement. Id. To be liable, each participant in the conspiracy need not

17

know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.  Id.  A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.  Id. at 856-57.

Defendant Scotland's ignorance of the December 5, 2012 search before it occurred does not necessarily mean that he did not participate in a conspiracy to retaliate against plaintiff for his legal activities.  Id. (conspirators must share the common objective of the conspiracy.)  It is undisputed that in October 2012, defendant Scotland asked defendant Ringler to help him monitor plaintiff while plaintiff used the telephone in his office.  While defendant Scotland claims that he only knew that plaintiff had a "court call," plaintiff alleges that defendant Scotland told defendant Ringler that "it's a prison lawsuit."  (ECF No. 90 at 4.)  Plaintiff also alleges that defendant Scotland told the judge that he did not want plaintiff using his phone.  (Id.)  Plaintiff also alleges that after the December 5, 2012 search, defendant Ringler asked him, "How did your case turn out?"

Based on the evidence discussed above, the undersigned finds that plaintiff has presented sufficient facts to create a dispute regarding whether defendant Scotland participated in a conspiracy to retaliate against him for his legal activities.  Whether defendant Scotland participated in this alleged conspiracy should be decided by a trier of fact.

*Did the Search Chill Plaintiff's Exercise of his First Amendment Rights?*

Defendants argue that the December 5, 2012 search of plaintiff's "cell" for cell phones did not chill plaintiff's exercise of his First Amendment rights because cell phones are prohibited.

The issue is not whether defendants' alleged retaliation chilled plaintiff's use of cell phones, but whether it chilled plaintiff's First Amendment activities.  As discussed above, whether the December 5, 2012 search for cell phones was a pretext for retaliation is a disputed fact.  For this reason, the undersigned cannot find that the search would not "chill or silence a person of ordinary firmness from future First Amendment activities."  Rhodes, 408 F.3d at 568.

////

////

18

1          *Conclusion*

2          For the reasons discussed above, the undersigned recommends that defendants' motion for

3   summary judgment as to plaintiff's claim alleging that the December 5, 2012 search of his "cell"

4   was retaliatory be denied.

5          F.  Analysis of Claim 2:  Alleged Retaliatory Destruction of Holy Korans During

6   December 5, 2012 Search

7          Plaintiff alleges that defendants Zuniga and Ringler destroyed and desecrated his Holy

8   Korans during the December 5, 2012 search in retaliation for his legal activities.[4]

9          Defendants move for summary judgment as to this claim on grounds that:  1) defendants

10  did not see plaintiff's Holy Korans during the December 5, 2012 search; 2) defendants were not

11  aware of whether plaintiff had previously engaged in any protected conduct; and 3) neither

12  defendant knew anything about plaintiff's religious beliefs or practices.

13         In his declaration filed in support of the summary judgment motion, defendant Ringler

14  states that he did not see any copies of the Koran, nor did he damage or destroy any copies of the

15  Koran.  (ECF No. 77-2 at 3.)  In his declaration, defendant Zuniga states that he does not recall

16  whether he saw any copies of the Koran during the search.  (ECF No. 77-3 at 2.)  Defendant

17  Zuniga states he did not destroy or damage any copies of the Koran.  (Id.)  Both defendants state

18  that at the time of the December 5, 2012 search, they were unaware of plaintiff's religious beliefs

19  or practices.  (ECF No. 77-2 at 4; ECF No. 77-3 at 3.)

20         In his second amended declaration, plaintiff alleges that his Holy Korans were destroyed

21  and desecrated during the December 5, 2012 search.  (ECF No. 90 at 5.)  Accordingly, the

22  undersigned finds that whether defendants destroyed or desecrated plaintiff's Korans during the

23  December 5, 2012 search is a disputed fact.

24         The undersigned does not understand defendants' argument that they had no previous

25  knowledge of plaintiff's religious beliefs or practices.  Even without previous knowledge of

26  plaintiff's religion, defendants' alleged destruction and desecration of plaintiff's Korans could

27  _____

28  [4]  In the reply, defendants appear to concede that plaintiff's claim that defendant Ringler
    destroyed his Holy Korans survives summary judgment.  (ECF No. 93 at 6 n.2.)

constitute retaliatory conduct.

Moreover, in his second amended declaration, plaintiff alleges that defendant Ringler had knowledge of his religion before the December 5, 2012 search. Plaintiff states that at some time prior to the December 5, 2012 search, defendant Ringler tried to block plaintiff from accessing the chapel for religious services. (ECF No. 90 at 3.) Plaintiff states that defendant Ringler would search Muslim inmates before they entered the chapel and ask them "why" they were attending religious services. (Id.) Plaintiff alleges that he observed that defendant Ringler did not subject other religious groups to these "restrictions." (Id.)

For the reasons discussed above, the undersigned recommends that defendants' summary judgment motion be denied with respect to plaintiff's claim that they destroyed and desecrated his Korans in retaliation for his legal activities.

G. Claim 3: Alleged Retaliatory Chrono

Plaintiff alleges that on January 17, 2013, defendant Ringler issued a chrono against him in retaliation for his legal activities. Defendants move for summary judgment on the grounds that defendant Ringler issued the chrono for a legitimate reason and because issuance of the chrono did not chill plaintiff's exercise of his First Amendment rights.

*Defendants' Evidence*

In his declaration submitted in support of the summary judgment motion, Correctional Counselor Henry states that on January 16, 2013, he received information from "my staff" indicating that plaintiff had created and posted in all Facility D housing units a bulletin containing accusations against defendant Ringler. (ECF No. 77-5 at 3.) "The bulletin read as if Ombudsman Jean Weiss and Legal Representative G. Interiano (mailing address included) were requesting that inmates come forward and provide complaints about Officer Ringler to them." (Id.) "It also contained accusations that Officer Ringler regularly engaged in 'unjust acts' such as destroying religious items and personal property of inmates." (Id.)

Based on the nature of the bulletin, Counselor Henry determined that it could be deemed as a solicitation for other inmates to create disorder. (Id.) Counselor Henry decided that plaintiff's presence at California State Prison-Solano was a threat to the safety and security of the

institution, staff and inmates.  (Id.)  For this reason, Counselor Henry issued an order on January 16, 2013, for plaintiff to be retained in administrative segregation pending a review for transfer to another institution.  (Id.)

In his declaration, defendant Ringler states that on January 16, 2013, defendant Scotland told him that bulletins containing accusations about him and those who worked with him, authored by plaintiff, had been posted in the inmate housing units on Facility D.  (ECF No. 77-2 at 4.)  Defendant Ringler states that plaintiff "admitted to his work supervisor that he had created the bulletin on his work computer in the Education Department during work hours."  (Id.) Defendant Ringler states that after the bulletin was posted, several inmates approached him out of concern and asked him to elaborate about the allegations, because rumors were running rampant throughout Facility D, and inmates were discussing it in groups.  (Id.)

Defendant Ringler felt threatened and believed that plaintiff posed a threat to his safety and to the security of the institution, staff and inmates.  (Id.)  Under these circumstances, defendant Ringler states that he had a responsibility to document the situation in a 128B chrono under the authority of California Code of Regulations, Title 15, § 3000.  (Id.)  128B chonos are reports that are used "to document information about inmates and inmate behavior," and they may include, but are not limited to, "documentation of enemies, records of disciplinary or classification matters, pay reductions, or inability to satisfactorily perform a job, refusal to comply with grooming standards, removal from a program, records of parole or social services matters."  (Id.)  Defendant Ringler states that he wrote a 128 chrono on January 17, 2013 documenting the situation involving the bulletin, to be placed in plaintiff's file.  (Id. at 4-5.)

The chrono, attached to defendant Ringler's declaration, states that on January 16, 2013, defendant Scotland informed him that bulletins containing accusations about him, authored by plaintiff, had been posted in Facility D housing units.  (ECF No. 77-2 at 10.)  The chrono states that the bulletins contained false information and that since their posting, several inmates had approached defendant Ringler asking him to elaborate on their content.  (Id.)  Defendant Ringler wrote that he felt that plaintiff's release to the general population would present a threat to his safety.  (Id.)  Defendant Ringler requested that plaintiff be transferred to a different institution.

(Id.)

The bulletin does not contain plaintiff's name.  (See ECF No. 77-2 at 7-8.)

*Did Issuance of the Chrono Advance Legitimate Correctional Goals?*

Defendants argue that defendant Ringler had a legitimate reason to write the 128 chrono: "to comply with his duty to document important information about plaintiff, reflecting behavior that could impact the safety of the institution."  (ECF No. 77-1 at 14.)   The problem with this argument is that defendants' evidence that defendant Ringler issued the chrono based on knowledge that plaintiff issued the bulletin is inadmissible hearsay.

In his declaration, defendant Ringler states,

> On January 16, 2013, Lt. Scotland informed me that bulletins containing accusations about me and those who work with me, authored by McMillan, had been posted in the inmate housing units on Facility D.

(ECF No. 77-2 at 4.)

Defendant Ringler's statement that defendant Scotland told him that plaintiff wrote the bulletin is hearsay.  In his declaration, defendant Scotland does not discuss the bulletin or statements he made to defendant Ringler regarding the bulletin.  (ECF No. 77-4.)

In his declaration, defendant Ringler also states that plaintiff "admitted to his work supervisor that he had created the bulletin on his work computer in the Education Department during his work hours."  (ECF No. 77-2 at 4.)   This statement is also hearsay.

The record contains no admissible evidence demonstrating how defendant Ringler knew that plaintiff authored the bulletin at the time defendant Ringler prepared the chrono.   Because defendants have provided no admissible evidence that defendant Ringler knew that plaintiff issued the bulletin at the time he prepared the chrono, defendants have not shown that defendant Ringler issued the chrono because he felt threatened by plaintiff.  Accordingly, defendants' motion for summary judgment on this ground should be denied.

*Did Issuance of the Chrono Chill Plaintiff's Exercise of his First Amendment Rights?*

Defendants argue that issuance of the chrono did not chill plaintiff's First Amendment rights because plaintiff had no First Amendment right to disseminate false information that was

intended to incite disorder and that was intended to encourage inmates to file false claims.

Defendants' argument that issuance of the chrono did not chill plaintiff's First Amendment rights presumes that plaintiff created the bulletin and that defendant Ringler knew that plaintiff created the bulletins when he prepared the chrono.

Defendants' summary judgment motion contains no admissible evidence that plaintiff created or posted the bulletin. In his declaration, Counselor Henry states that he was told by his staff that plaintiff created and posted the bulletins. (ECF No. 77-5 at 3.) This statement is inadmissible hearsay. In his declaration, defendant Ringler states that plaintiff admitted to his work supervisor that he created the bulletin. (ECF No. 77-2 at 4.) This statement is also inadmissible hearsay.

In his unverified statement of disputed facts, plaintiff states that he admitted writing his "complaint" against defendant Ringler, but not a "bulletin." (ECF No. 91 at 9.)

In the second amended declaration, plaintiff states, in relevant part,

> 72.  When I drafted the 602 grievance and staff complaint in or around December 7, 2012 as well as letter seeking investigation of defendant Ringler's actions I believe were harassment and retaliation, I did so on computers used by the general inmate population.

> 73.  When I drafted the staff complaint and letters to the district attorney's office containing complaints about defendant Ringler on or around December 7, 2012 I did not intend for this information to be seen or used by any other inmate. I did not distribute this information to the general inmate population at CSP Solano. I did not post or hang any documents containing allegations against defendant Ringler in any housing units in CSP Solano.

(ECF No. 90 at 9.)

In the reply, citing the paragraphs quoted above, defendants argue that plaintiff admitted writing the bulletin, and only disputed whether he distributed it. It is not clear to the undersigned that plaintiff admits writing the bulletin in the paragraphs quoted above. In these paragraphs, plaintiff states that he wrote a staff complaint, 602 grievance and a letter to the district attorney. The bulletin that was posted was not a staff complaint, 602 grievance or letter to the district attorney. (See ECF No. 77-2 at 7-8.)

////

23

In the reply, defendants also argue that during an investigation regarding plaintiff's use of the work computer to create the bulletin, plaintiff admitted writing the bulletin. Defendants cite the rules violation report containing a statement by plaintiff's work supervisor that plaintiff indicated that he was the author of the document. (ECF No. 86 at 123.) This unverified statement is inadmissible hearsay.

Defendants also cite the section of the rules violation report containing plaintiff's statement,

> I arrived to work that day at 1230 hours. The flyers had already been printed and the other clerks were being questioned. We don't have access to the printers. Mr. Muldong is the only one with access. He has to come over and unlock them for us to access printed items. The flyers in question were printed in color and we don't have colored printers in that area. I admitted authoring some of the information on the flyer. I authored the same facts that I listed in my citizens complaint against Officer Ringler. I did not author the entire flyer nor did I print it. Mr. Muldong gave me a verbal counseling about misuse of the computers and erased the documents from the computer.

(Id. at 129.)

The court cannot consider plaintiff's statement in the rules violation report because it is not verified.

For the reasons discussed above, the undersigned finds that defendants have not demonstrated that plaintiff created the bulletin. For that reason, and because defendants have not demonstrated that defendant Ringler knew that plaintiff authored the bulletin when he prepared the chrono, defendants have not shown that issuance of the chrono did not chill plaintiff's First Amendment rights.

*Conclusion*

For the reasons discussed above, the undersigned recommends that defendants' motion for summary judgment as to plaintiff's claim that defendant Ringler issued the chrono in retaliation for his legal activities be denied.

H. Claim 4: Did Defendant Ringler Confiscate Plaintiff's Property in Retaliation for his Legal Activities?

Plaintiff alleges that defendant Ringler confiscated his personal property following the

December 5, 2012 search in retaliation for his legal activities. Defendants move for summary judgment as to this claim on grounds that defendant Ringler took no adverse action against plaintiff because the confiscated items did not belong to plaintiff.

*Undisputed Facts*

During the December 5, 2012 search, defendant Ringler confiscated all of plaintiff's electronic devices. (ECF No. 77-2 at 2.) Defendant Ringler reviewed plaintiff's property to determine which items plaintiff owned, and which items were "floaters" – property that does not belong to any inmate and which no inmate is entitled to possess. (ECF No. 77-6 at 5; ECF No. 91 at 11.) Defendant Ringler determined that only the typewriter belonged to plaintiff, and returned it to him. (ECF No. 77-6 at 5.)

In addition to the cell phone and accessories, defendant confiscated the following items from plaintiff: 1) Sony radio-Mod. #25-X1 unsealed with six screws missing with another inmate's name removed; 2) Colby universal ac/dc adaptor with two names removed; 3) lamp with the inmate name Sagasta D-16756; 4) Vanson universal battery charger with one name removed and unsealed; 5) RCA TV seral number 81351109 with one name removed. (ECF No. 77-6; ECF No. 91 at 11.)

Plaintiff admits that all of the confiscated items except for the Sony radio and television did not belong to him. (ECF No. 91 at 13.)

*Discussion*

Defendant Ringler's argument on summary judgment focuses exclusively on his reason for confiscating the television and radio. Defendant claims that that these items did not belong to plaintiff.[5] However, confiscation of the television and radio is not the only conduct material to

---

[5] In the opposition, plaintiff contends that the confiscated radio belonged to him. (ECF No. 91 at 12.) In support of this claim, plaintiff cites exhibit A attached to his second amended declaration. (ECF No. 90 at 11.) Exhibit A is a property inventory form dated September 6, 2011, stating that plaintiff owned a Sony boom box, model 25-N, serial number 1109647. (Id.) The model number of this boom box is different from the model number of the radio confiscated by defendant Ringler on December 5, 2012. Therefore, this inventory form does not demonstrate that plaintiff owned the radio confiscated on December 5, 2012.

The undersigned also observes that, regarding the television, in his declaration defendant Ringler states, in relevant part, (10). "McMillan gave me a receipt for the TV, in an attempt to

25

plaintiff's claim that defendant Ringler retaliated against him when he confiscated these items. Defendant's argument ignores the relevance of the search itself. As discussed above, whether the search was conducted for retaliatory reasons is at issue. In his second amended declaration, plaintiff claims that he had the television during several searches at CSP-Solano without it being confiscated. (ECF No. 90 at 2.) Plaintiff's claim that his television was not confiscated during previous searches is also alleged evidence that the confiscation was motivated by retaliation.

Taken as a whole, even if plaintiff was not authorized to possess the television and radio, the record puts defendant Ringler's motives for confiscating those items at issue. Accordingly, defendant Ringler should be denied summary judgment as to this claim.

I. Claim 5: Alleged Violation of the Bane Act

Plaintiff raises two Bane Act claims. First, plaintiff alleges that defendants conspired to interfere with his religious beliefs by destroying and desecrating his Holy Korans. Second, plaintiff alleges that defendants conspired to retaliate against him for his legal activities by destroying and desecrating his Holy Korans. (ECF No. 55 at 22.)

The Bane Act proscribes conduct by any person, "whether or not acting under color of law," who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state. . . ." Cal. Civ. Code § 52.1(a). An action may be brought by the government, id., or by an individual, id. § 52.1(b), in a "civil action for damages, including, but not limited to, damages under Section 52,[6] injunctive relief, and other appropriate equitable

_____

show that it belonged to him and was not a floater. I found no name on the receipt. I went to the Receiving and Release Department, and the sergeant there called Access and provided the order number. It showed that the TV belonged to another inmate –Inmate Gordon (C-25780 20-13-6-L). McMillan had tried to use inmate Gordon's receipt to get the TV back from me." (ECF No. 77-2 at 3.)

The paragraph quoted above contains inadmissible hearsay. Defendant Ringler's statement regarding how he came to know that the television belonged to inmate Gordon is hearsay. In addition, defendant Ringler's statement that "it showed that the TV belonged to another inmate," is unclear, because defendant Ringler does not identify the "it."

[6] Damages recoverable under Cal. Civil Code 52(b) are as follows:

relief to protect the peaceable exercise or enjoyment of the right or rights secured," id.

"To obtain relief under Civil Code section 52.1, a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion." O'Toole v. Superior Court, 140 Cal. App. 4th 488, 502 (2006), citing Venegas v. Cnty. of Los Angeles, 32 Cal. 4th 820, 841-43 (2004). Section 52.1 "require[s] an attempted or completed act of interference with a legal right, accompanied by a form of coercion." Jones v. Kmart Corp., 17 Cal. 4th 329, 334 (1998) (quoted with approval in City and Cnty. of San Francisco v. Ballard, 136 Cal. App. 4th 381, 409 (2006)). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., threats, intimidation or coercion), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." Shoyoye v. Cnty. of Los Angeles, 203 Cal. App. 4th 947, 956 (2012) (citations and internal quotation marks omitted). "Technically, whether a constitutional violation occurred and whether that violation was accompanied by any threats, intimidation or coercion are separate analytical inquiries (albeit with intertwining facts)." Barsamian v. City of Kingsburg, 597 F. Supp. 2d 1054, 1057 (E.D. Cal. 2009).

"It may be true that this section and other similar California statutes were enacted in response to the alarming increase in hate crimes. Nevertheless, there is no requirement that the

---

. . . (b) Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following:

(1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2) A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney. An action for that penalty brought pursuant to Section 51.7 shall be commenced within three years of the alleged practice.

(3) Attorney's fees as may be determined by the court.

violence be extreme or motivated by hate in the plain language of the sections, or in the cases construing them; there is also no requirement that the act constitute a crime.  If the California legislature wanted to limit the reach of the statute to extreme, criminal acts of violence, it could have explicitly said so."  <u>Winarto v. Toshiba Am. Elec. Components, Inc.</u>, 274 F.3d 1276, 1289 (9th Cir. 2001) (citations and internal punctuation marks omitted).

The elements of a claim under section 52.1 are:

> (1) that the defendant interfered with or attempted to interfere with the plaintiff's constitutional or statutory right by threatening or committing violent acts; (2) that the plaintiff reasonably believed that if she exercised her constitutional right, the defendant would commit violence against her or her property [or] that the defendant injured the plaintiff or her property to prevent her from exercising her right or retaliate[d] against the plaintiff for having exercised her right; (3) that the plaintiff was harmed; and (4) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.

<u>McCue v. South Fork Union Elementary School</u>, 766 F. Supp. 2d 1003, 1010 (E.D. Cal. 2011) (citing <u>Austin B. v. Escondido Union School Dist.</u>, 149 Cal.App.4th 860, 882 (2007), and CACI No. 3025).

Under California law, civil conspiracy requires a plaintiff to plead that "the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement."  <u>See</u> <u>Gilbrook v. City of Westminster</u>, 177 F.3d 839, 856 (9th Cir. 1999) (citing <u>Vieux v. Easty Bay Reg'l park Dist.</u>, 906 F.2d 1330, 1343 (9th Cir. 1990)). Each conspirator "need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  <u>Id.</u> at 856.

*Conspiracy to Retaliate For Legal Activities*

Defendants move for summary judgment as this claim on the grounds they could not have retaliated against plaintiff for his legal activities, because prior to the December 5, 2012 search plaintiff had never filed a grievance against defendant Ringler or Zuniga.   Defendants argue that prior to the December 5, 2012 search, defendants Ringler and Zuniga were unaware of whether plaintiff had filed any grievances or lawsuits against other prison officials.  Defendants claim that neither defendant Ringler or Zuniga discussed plaintiff's legal activities with each other, defendant Scotland, or anyone else.  Defendants also argue that defendant Scotland was only

generally aware of plaintiff's legal activities.

As discussed above, whether defendants Ringler and Zuniga had knowledge of plaintiff's legal activities at the time of the December 5, 2012 search is a disputed fact. In addition, the extent of defendant Scotland's knowledge of plaintiff's prior legal activities is a disputed fact.

Defendants also argue that defendant Scotland should be granted summary judgment as to plaintiff's claim that defendants conspired to retaliate against for his legal activities because defendant Scotland had no knowledge of plaintiff's religious beliefs at the time his Holy Korans were allegedly destroyed and desecrated. Even if defendant Scotland had no knowledge of plaintiff's religious beliefs, whether he shared a common objective with defendants Ringler and Zuniga to retaliate against plaintiff for his legal activities is disputed. Plaintiff's claim that defendant Scotland conspired to retaliate against him does not fail because defendant Scotland did not know the exact details of the plan.

Defendants also argue that there is no evidence that defendants had a meeting of the minds to conspire against plaintiff for his legal activities. The undersigned above found that whether defendants conspired to retaliate against plaintiff for his legal activities by searching his cell is a disputed fact. For the same reasons, the undersigned finds that whether defendants conspired to retaliate against plaintiff for his legal activities, in violation of the Bane Act, is also disputed.

*Conspiracy to Interfere with Religion*

Defendants also move for summary judgment as to plaintiff's claim that they conspired to violate his right to religious freedom, in violation of the Bane Act, on the grounds that prior to the December 5, 2012 search, they were unaware of plaintiff's religious beliefs or practices. As discussed above, whether defendant Ringler had prior knowledge of plaintiff's religious beliefs is a disputed fact.

Plaintiff has presented no evidence that defendant Zuniga had prior knowledge of his religious beliefs. However, whether defendants Zuniga and Ringler together destroyed and desecrated his Holy Korans during the December 5, 2012 search is disputed. If defendant Zuniga destroyed and desecrated the Holy Korans during the search, then his alleged prior ignorance of plaintiff's religious beliefs does not mean that he did not violate the Bane Act by engaging in this

conduct.

In his declaration, defendant Scotland states that at the time of the events of this case, he was unaware of plaintiff's religious beliefs or practices. (ECF No. 77-4 at 3.) Plaintiff has presented no evidence that defendant Scotland had knowledge of his religious beliefs prior to or during the December 5, 2012 search. Therefore, because it is undisputed that defendant Scotland had no knowledge of plaintiff's religious beliefs at the time of the search, defendant Scotland should be granted summary judgment as to plaintiff's Bane Act claim based on an alleged violation of his right to practice his religion.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion to strike (ECF No. 95) is denied;

2. Plaintiff's motion to strike (ECF No. 100) is denied;

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion to file a supplemental complaint (ECF No. 78) be denied;

2. Defendants' motion for summary judgment (ECF No. 77) be granted as to the claim that defendant Scotland conspired to violate plaintiff's right to practice his religion in violation of the Bane Act; defendants' motion be denied in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 22, 2018

Mc578.sj

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE